IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TYRUN W.,                                    )
                                             )
                    Plaintiff,               )
                                             )
          v.                                 )          1:23CV719
                                             )
MARTIN J. O'MALLEY,[1]                       )
Commissioner of Social Security,             )
                                             )
                    Defendant.               )

<u>MEMORANDUM OPINION AND ORDER</u>
<u>OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Tyrun W. ("Plaintiff") brought this action pursuant to Sections 205(g) and

1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and

1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security

denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under, respectively, Titles II and XVI of the Act.  The parties have filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

I.        <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed applications for DIB and SSI on June 2, 2020, alleging a

disability onset date of April 7, 2017 in both applications.  (Tr. at 17, 281-96.)[2]  His applications

were denied initially (Tr. at 103-56, 185-91) and upon reconsideration (Tr. at 157-84, 192-201).

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 207-08.) On December 13, 2022, Plaintiff, along with his attorney, attended the subsequent telephone hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 17.) At the hearing, the ALJ noted that Plaintiff had previously applied for benefits, and his claims had been denied by the same ALJ in a decision dated May 15, 2019, which concluded that Plaintiff remained capable of a limited range of light work. (See Tr. at 49-51, 86, 92.) That decision was not appealed. At the hearing in the present case, Plaintiff amended his alleged onset date to September 20, 2019, four months after the date of the prior decision. (Tr. at 17, 49.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 34), and on June 27, 2023, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

2

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

3

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional

_____

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

4

capacity ("RFC")." Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify

as disabled. Id. at 179-80.  However, if the claimant establishes an inability to return to prior

work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

a significant number of jobs exist which the claimant could perform, despite the claimant's

impairments." Hines, 453 F.3d at 563.  In making this determination, the ALJ must decide

"whether the claimant is able to perform other work considering both [the claimant's RFC]

and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust

to a new job." Hall, 658 F.2d at 264-65.  If, at this step, the Government cannot carry its

"evidentiary burden of proving that [the claimant] remains able to work other jobs available

in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful

activity" since his amended alleged onset date of September 20, 2019.  The ALJ therefore

concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr.

at 19.)  At step two, the ALJ further determined that Plaintiff suffered from the following

severe impairments:

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d
at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-
related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8
hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks
omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's
"ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations
(mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after
[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."
Hines, 453 F.3d at 562-63.

sarcoidosis; neurosarcoidosis; seizure disorder; right shoulder impingement; degenerative disc disease [of the] cervical spine; headache; depressive disorder; anxiety disorder; and sleep disturbance[.]

(Tr. at 19-20.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 20-22.) The ALJ therefore assessed Plaintiff's RFC and determined that he could perform light work with the following, non-exertional limitations:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequent climbing of ramps and stairs, but only occasional climbing of stepladders up to 4 vertical feet in height, with no climbing of higher ladders or of ropes or scaffolds of any height. [He] can have frequent balancing, stopping, kneeling, crouching, and crawling; frequent pushing and pulling with the right (dominant) upper extremity; frequent overhead reaching with the bilateral upper extremities; and can have occasional exposure to extreme cold and heat, vibration, atmospheric conditions, and moving mechanical parts. There can be no exposure to high, exposed places; no operation of motor vehicles or heavy equipment required as part of the assigned work; no work performed in or on large bodies of water such as oceans, lakes, rivers, or swimming pools, and only occasional use of computer and video monitors, further defined as no more than one third of the workday, with no more than 45 minutes during any one sustained period of time, which must be followed by 60 minutes of no use of such devices before resumption of use. [Plaintiff] can have exposure up to and including moderate noise. [He is] limited to work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation and judgment are needed. [He is] limited to work requiring sustained concentration and persistence for no greater than approximately 2 hours at a time; limited to work that is not frequently performed on an assembly line or at a similar production-pace; can have occasional changes to the work setting and the manner and method of performing the assigned work; work that frequently provides for two 15-minute breaks and one 30-minute break for each 8-hour shift worked, occurring at such times as directed by the employer; and can have occasional interaction with supervisors, coworkers, and the public when performing the assigned work.

(Tr. at 22-23.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff's past relevant work exceeded his RFC.

6

(Tr. at 32.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 33-34.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 34.)

Plaintiff now challenges the RFC assessment in two respects. First, he argues that, when assessing Plaintiff's RFC, the ALJ "erred by failing to adequately account for the vocationally limiting effects of Plaintiff's well-documented fatigue and shortness of breath." (Pl.'s Br. [Doc. #11] at 1, 5-9.) Second, Plaintiff contends that the ALJ "erred in his evaluation of the medical opinion evidence." (Pl.'s Br. at 1, 9-14.) Because Plaintiff's first argument relies, in part, on the medical opinion evidence supporting his fatigue and shortness of breath, the Court addresses these contentions in reverse order.

A. Medical Opinion Evidence

Plaintiff contends that in formulating the RFC assessment, the ALJ failed to properly evaluate the medical opinion of Plaintiff's treating rheumatologists, Drs. Rami Eltaraboulsi and Christopher Overton, both of whom posited that Plaintiff's physical impairments precluded employment. (See Tr. at 342, 3778.) Under the applicable regulations for claims filed on or after March 27, 2017,

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .
>
> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his

or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) <u>Consistency.</u> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) <u>Relationship with the claimant</u> . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .

(4) <u>Specialization.</u> The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) <u>Other factors</u>. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in . . . [their] decisions how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2).

Here, as set out in the administrative decision, Dr. Eltaraboulsi opined on December 16, 2019 "that due to sarcoidosis with neurological involvement, severity of the disease, side

effects from medications, and the need for frequent clinic and effusion visits, [Plaintiff] was not able to work at this time." (Tr. at 31, 342.) The ALJ found Dr. Eltaraboulsi's opinion unpersuasive, noting that "it is conclusory and addresses a decision specifically reserved for the Commissioner." (Tr. at 31.) The ALJ further explained that

> [Plaintiff's symptoms are not described in detail, nor do [the opinions] describe how [Plaintiff's symptoms] would impact [his] ability to work on a full-time basis. While [Plaintiff] continues to have sarcoidosis, an examination in April 2021 showed he was "quiet," and had no signs of ocular sarcoidosis. He had some issues with compliance in March 2021, but he was to continue taking methotrexate (Exhibit B21F, page 15). [Plaintiff] remains able to perform at the range of light [work] with some additional limitations since the last decision in May 2019.

(Tr. at 31.) Similarly, the ALJ recounted that, on May 24, 2022, Dr. Overton "stated that due to continued intermittent seizures, numbness of head/face and bilateral lower extremities, and debilitating fatigue from [his] underlying inflammatory condition, [Plaintiff] remains unable to work at this time." (Tr. at 31, 3778.) As with Dr. Eltaraboulsi's opinion, the ALJ noted that Dr. Overton's opinion was conclusory and addressed an issue reserved to the Commissioner. (Tr. at 31-32.) The ALJ further explained that,

> [w]hile Dr. Overton does note specific disabling symptoms, the vagueness, including reporting "intermittent" seizures without further explanation[,] results in the opinion being non-specific. The longitudinal evidence, including a note from November 2021 where [Plaintiff] denied any "major" seizures over the past year but reported several "mini seizures" at night, generally after a day of strenuous physical activity, is consistent with the limitation to a range of light [work] as outlined in the [RFC assessment].

(Tr. at 32.)

Plaintiff now argues that the ALJ's explanations for discounting both rheumatologists' opinions were insufficient under 20 C.F.R. § 404.1520c. In particular, Plaintiff contends that the ALJ failed to specifically address the consistency and supportability of Drs. Eltaraboulsi

9

and Overton's opinions, as required by 20 C.F.R. § 404.1520c(b)(2), which dictates that the ALJ "will explain" how the consistency and supportability factors were considered in the decision. (Pl.'s Br. at 10.) As expressed in a one recent decision,

> [an ALJ's] failure to articulate the consistency factor in his evaluation of [the physician's] opinion constitutes error. See 20 C.F.R. § 404.1520c(b)(2). This court cannot "fill in the blanks for the ALJ" by finding substantial evidence supports the ALJ's evaluation of [an] opinion when the ALJ did not even address the consistency factor, nor may the court "bolster[ ] inconclusive findings" when the ALJ did not discuss the extent to which [the physician's] opinion was either consistent or inconsistent with the evidence in the record. See Patterson [v. Comm's of Soc. Sec Admin.], 846 F.3d [656,] 662 [(4th Cir. 2017)]. Absent any explanation by the ALJ whether [the medical] opinion was consistent or inconsistent with the record, this court cannot meaningfully review how the ALJ evaluated the persuasiveness of [the] opinion and whether substantial evidence supports the ALJ's determination.

Cantrell v. Kijakazi, No. 2:21CV00021, 2022 WL 3335778, at *10 (W.D. Va. Aug. 12, 2022). Nevertheless, there is no requirement that an ALJ use any "magic words" in making findings regarding consistency and supportability. See Weidner v. Kijakazi, No. 20-1250-MN, 2022 WL 610702, at *12 (D. Del. Feb. 1, 2022) (finding the fact that the ALJ did not use "consistency" or "supportability" is not sufficient to remand where the "ALJ plainly considered the consistency of the medical opinions with the evidence of record"). Thus, the ALJ's failure to specify which factor, i.e., supportability, consistency, or otherwise, was eroded by contrary evidence is inapposite, so long as he (1) analyzed the relevant evidence when considering the persuasiveness of the medical opinion and (2) made his analysis of that evidence clear enough for the court to meaningfully review it.

Here, the unfavorable, final decision in Plaintiff's prior disability claim and the other medical opinion evidence of record clearly support the ALJ's consistency determination. On May 15, 2019, just four months before the September 20, 2019 amended alleged onset date in

the present case, the same ALJ determined that Plaintiff remained capable of a limited range of light work. (See Tr. at 86, 92.) In the present case, the ALJ therefore considered <u>Albright v. Comm'r of Soc. Sec. Admin.</u>, 174 F.3d 473 (4th Cir. 1999) and Acquiescence Ruling ("AR") 00-1(4) when evaluating the prior determination. (Tr. at 29.) Specifically, the ALJ found as follows:

> [T]his decision remains generally consistent with the evidence during the current period under consideration, although some modification is appropriate. Therefore, this previous decision is generally, but not entirely, persuasive. In the previous decision, the evidence generally supported the limitation to light work with mental restrictions. However, later evidence showing reduced strength results in only frequent overhead reaching with the bilateral upper extremities as opposed to only the right dominant upper extremity with the bilateral upper extremities as opposed to only the right dominant upper extremity.

(Tr. at 29.) The ALJ therefore included in the RFC a limitation to only frequent overhead reaching with the bilateral upper extremities, and noted that review of the record reflected that the previous decision was generally persuasive, and that the record reflected "less seizures overall" since the prior determination, which was not appealed. (Tr. at 29.)

Following this analysis, the ALJ considered the nine medical opinions postdating his prior administrative decision. Six of these opinions, including those of Drs. Eltaraboulsi and Overton, assessed Plaintiff's physical limitations. (Tr. at 29-32.) Despite Plaintiff's assertion that the opinions of his rheumatologists were supported by, and consistent with, not only his own testimony but the other medical opinions of record as well (see Pl.'s Br. at 13), Drs. Eltaraboulsi and Overton were the only two of the six providers to posit that Plaintiff was limited beyond a range of light work (Tr. at 29-32). Of the other four, the two State agency medical consultants, Dr. Steven Levin and Dr. Harry Gallis, opined on March 25, 2021 and

December 17, 2021, respectively, that Plaintiff was limited to light work with further restrictions. (Tr. at 30-31.)

> [Dr. Levin] opined that [Plaintiff] was limited to light work with frequent pushing, pulling with the right upper extremity; [no] climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching with the right upper extremity; [no] even moderate exposure to extreme cold or heat, noise, [or] hazards; and [no] concentrated exposure to vibration, humidity, and pulmonary irritants.

(Tr. at 30-31, 105-119.) Although the ALJ found that Dr. Levin's opinion was "not entirely persuasive," he acknowledged that "it is generally supported by the record showing some non-compliance historically in November 2020 and some difficulty sitting and rising in March 2021." (Tr. at 30.) The ALJ also noted that the longitudinal record demonstrates greater stability, fewer seizures, and continued reports of weakness and dizziness "consistent with only occasional use of computer and video monitors and the other limitations as outlined in the residual functional capacity. (Tr. at 30.)

Nine months later, at the reconsideration level, Dr. Gallis largely confirmed Dr. Levin's earlier findings. Dr. Gallis specifically considered Plaintiff's symptoms, including shortness of breath, and noted that "[r]ecent exams show no evidence of cardiac sarcoidosis. Exams over time show intermittent dyspnea with exams overall intact." (Tr. at 163, 165.) Dr. Gallis concluded that Plaintiff could perform "light work except was further limited with frequent pushing, pulling of the bilateral upper extremities but the other limitation remained the same." (Tr. at 31.) The ALJ largely adopted Dr. Gallis' limitations, but found Dr. Gallis' opinion "not entirely persuasive" to the extent that the ALJ noted he had "place[d] additional limitations that are consistent with the overall evidence demonstrating some continued difficulty

breathing with worsening joint pains." (Tr. at 31.) The ALJ also specifically found that the evidence of "decreased lung sounds and a mildly ataxic gait does support the limitations to a light range of work." (Tr. at 31.)

Notably, as part of their review of the record, the State agency physicians considered the findings of Danielle Adkins, PA-C, who performed a consultative examination of Plaintiff on March 20, 2021. (Tr. at 31, 3220-29.) As recounted in the administration decision,

> The examination revealed vision of 20/30 [in] both eyes, medical deviation of lateral rectus bilaterally; positive ophthalmoplegia; and decreased lung sounds [in the] lower fields bilaterally. Ms. Adkins noted [that Plaintiff] had reduced function [of] cranial nerves 2, 4, and 6, had difficulty rising from sitting to standing, and had mild gait ataxia. He could squat and rise with some difficulty and had some difficulty getting up and down from [the] exam table, but otherwise had an unremarkable exam. Ms. Adkins opined that [Plaintiff] was mildly restricted in standing, walking, lifting, and carrying . . . and had visual accommodation deficiencies with moderate limitation.

(Tr. at 31.) In finding Ms. Adkins' opinions "not entirely persuasive," the ALJ correctly noted that Ms. Adkins "does not define what 'mild' difficulties means or what a 'mild' gait ataxia means in vocational terms." (Tr. at 31.) Nevertheless, the ALJ concluded that Ms. Adkins' overall findings "of sarcoidosis that was relatively stable" supported the range of light work set out in the RFC assessment. (Tr. at 31.) In particular, the ALJ noted that "[t]he overall evidence, including report of no major seizures in the past year on November 2021 shows that [Plaintiff's] seizures are infrequent and his sarcoidosis has stabilized." (Tr. at 31.)[5]

Finally, the ALJ considered the opinion of Dr. Siddarth Ninan, Plaintiff's treating neurologist. On November 17, 2021, Dr. Ninan opined that Plaintiff "was to continue seizure

---

[5] This is consistent with the findings of Dr. Levin and Dr. Gallis, both of whom considered and relied on the examination and report by PA Adkins in reaching the conclusion that Plaintiff was capable of light work with the additional limitations noted. (Tr. at 105, 111, 115, 160, 163-64.)

precautions including but not limited to [no] swimming alone, cooking alone, climbing high altitudes, [and] operating heavy machinery." (Tr. at 32, 3740.) Dr. Ninan also advised that, "to avoid headaches, [Plaintiff] should limit screen time as able, [and] consider using blue blocking filters/glasses." (Tr. at 32, 3740.) The ALJ found these restrictions persuasive and "generally incorporated" them in Plaintiff's RFC. (Tr. at 32.) The ALJ further noted that with respect to Dr. Ninan's opinion, Plaintiff "endorsed 5 nocturnal seizures the past year despite report[ing] good compliance with medication. His seizures tended to occur after a strenuous day proceeding the seizures, so the limitations are supported by self-report and the stability of his immunotherapy." (Tr. at 32.)

Again, none of these opinions suggest the need for limitations beyond those ultimately included in the RFC, let alone the total disability opined by Drs. Eltaraboulsi and Overton. Thus, the ALJ clearly explained how the opinions of Plaintiff's treating rheumatologists were inconsistent with the findings from other medical sources, prior administrative findings, and other evidence, as contemplated by the regulations. See 20 C.F.R. § 404.1520c(c).

The same holds true for the supportability factor at issue here. In fact, the ALJ specifically found both opinions conclusory. In the case of Dr. Eltaraboulsi, he also noted that Plaintiff's "symptoms were not described in detail, nor do they describe how they would impact [Plaintiff's] ability to work on a full-time basis." (Tr. at 31.) In the case of Dr. Overton, the ALJ found that the opinion "[did] note specific disabling symptom," but the ALJ further determined that the listed symptoms, particularly "intermittent" seizures, were vague and non-specific given both (1) the lack of further explanation from Dr. Overton and (2) contradictory evidence elsewhere in the record. (Tr. at 32.)

14

Notably, Plaintiff's sarcoidosis involves multiple body systems, necessitating treatment by neurology, pulmonology, and ophthalmology, as well as rheumatology. As the ALJ explained earlier in his decision, records from all of these providers reflect that Plaintiff had ongoing compliance issues with his neurosarcoidosis medications throughout the relevant time period. (See Tr. at 25, 26, 3582, 3677, 3799, 3800, 4093, 4094.) Nevertheless, Plaintiff generally reported decreased seizure activity, with rare nocturnal seizures occurring after particularly active days. (Tr. at 26.) Rheumatology treatment notes also reflect that Plaintiff was "doing well from [a] respiratory standpoint," but still reported some dyspnea and use of an albuterol inhaler multiple days per week. (Tr. at 26, 3582, 4094.) Moreover, Plaintiff reported only "intermittent" fatigue, joint pain, and night sweats throughout this time, despite his lack of medication compliance. (Tr. at 25-26, 3582, 3625, 3677, 3800.) In short, none of the clinical findings recorded by Dr. Eltaraboulsi, Dr. Overton, or their colleagues appear to support their opinions that Plaintiff suffered from "debilitating fatigue" or other disabling symptoms. In discussing the underlying evidence in this case, along with the opinions of Drs. Eltaraboulsi and Overton, the ALJ explained the lack of supporting evidence in a manner susceptible to judicial review. Therefore, the Court concludes that substantial evidence supports the ALJ's treatment of the opinion evidence in this case.

B. Function-by-Function Assessment

In a related argument, Plaintiff contends that the ALJ failed to "adequately account for the vocationally limiting effects of Plaintiff's well-documented fatigue and shortness of breath" when assessing his RFC. (Pl.'s Br. at 1, 5-9.) In particular, Plaintiff argues that, although the evidence supports additional RFC limitations, including additional breaks,

15

absences, and time off-task, the ALJ failed to include these limitations or, alternatively, explain their omission. (Pl.'s Br. at 6.)

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996) ("SSR 96-8p"). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis

16

frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

Here, Plaintiff challenges the ALJ's analysis of evidence relating to Plaintiff's fatigue and shortness of breath. As Plaintiff correctly notes, "the ALJ found [Plaintiff's] sarcoidosis and neurosarcoidosis, which are the primary cause of his fatigue and [shortness of breath], to be severe impairments (see Tr. at 19-20) and summarized some of his complaints and portions of his course of treatment from the record." (Pl.'s Br. at 6.) Plaintiff now contends that the ALJ failed to create a "logical bridge between the evidence describing [Plaintiff's] severe fatigue and [shortness of breath] and [his] conclusion that no non-exertional limitations related to these symptoms such as additional breaks, absences or time off-task were required in the RFC." (Pl.'s Br. at 6.)

Plaintiff further argues that the omission of these additional limitation was "potentially outcome determinative" in light of the vocational expert's testimony at step five of the sequential analysis. (Pl.'s Br. at 6.) In particular, the expert testified that, outside of normal breaks consisting of a 30-minute meal break and two additional 15-minute breaks per 8-hour workday, employers typically tolerate up to 10% off-task time. (Tr. at 75.) "Thus," Plaintiff argues, "it would appear that if [his] testimony regarding his fatigue and [shortness of breath] are true and impact his life in the ways he stated, then his condition would be disabling because

17

he would certainly be off-task due to his [impairments] more than 10% of the workday." (Pl.'s Br. at 5.) In other words, Plaintiff's function-by-function challenge relies on the premise that the ALJ also erred in his assessment of Plaintiff's subjective statements.

With respect to evaluation of a claimant's symptoms, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 416.929. In Arakas v. Commissioner of Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95–96. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which a claimant's pain or other symptoms limit his ability

to perform basic work activities. Relevant evidence for this inquiry includes the claimant's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i)    [The claimant's] daily activities;

(ii)    The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has] taken to alleviate [his] pain or other symptoms;

(v)    Treatment, other than medication, [the claimant] receive[s] or [has] received for relief of [his] pain or other symptoms;

(vi)    Any measures [the claimant] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)    Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

In the present case, the ALJ recounted Plaintiff's testimony that he "got winded when he did chores," including walking to the mailbox, and that he experienced spells of shortness of breath or dizziness. (Tr. at 23-24, 64-65.) Plaintiff further testified that these spells typically lasted 5-10 minutes, requiring him to sit down, drink water, and then lay down. (Tr. at 24, 67.) The ALJ ultimately found that Plaintiff "generally overstates his limitations based on the whole record and the greater weight of the evidence." (Tr. at 24, 27-28.) In doing so, the ALJ specifically relied on Plaintiff's activities, his treatment records, and objective medical evidence. For example, the ALJ explained that Plaintiff "endorsed typical daily activities of sleeping, playing games, and walking outside," and that "examination revealed that while he did have reduced lung sounds, he had no wheezes, rales, or rhonchi." (Tr. at 28.) The ALJ also noted that "once he began being more compliant with his medication, his symptoms decreased," and that ultimately he remained "able to perform a range of light work with mental

limitations." (Tr. at 28.) Similarly, in assessing the severity of Plaintiff's impairments, the ALJ

explained that

> [Plaintiff] testified that he would get winded walking to his mailbox, but the
> evidence shows he presented in September 2022 and had been feeling well from
> a breathing standpoint until he recently developed chest pain and dyspnea that
> improved with inhalers. His examination was negative with no pedal edema,
> clubbing or cyanosis and good air movement bilaterally. The record from March
> 2021 showed that [Plaintiff] enjoyed walking outside. . . .

> The medical evidence shows [that Plaintiff] presented to pulmonology on
> September 21, 2022. He had an essentially normal CPET test in August 2017
> with exception of a slight increase in ventilation relative to his VO2. The test
> was prematurely stopped before he reached the anaerobic threshold due to knee
> pain. A computed tomography (CT) of the chest in January 2018 revealed near
> complete resolution of bilateral nodule and groundglass opacities, compatible
> with infection. A repeat pulmonary function test on May 18, 2021, showed he
> had mild obstructive lung disease with his FEV1 improved compared to prior.
> He had mildly reduced DLCO, worse compared to prior. . . .

> . . . .

> [Plaintiff] presented to the rheumatology clinic on June 21, 2022, for evaluation.
> He had previously been treated with Remicade that was discontinued due to
> side effects. He was more recently on methotrexate, but this was discontinued
> in January 2021 due to gastrointestinal upset. So, he was then started on Humira,
> but his adherence remained incomplete. Nevertheless, he had a reassuring exam
> and recent evaluations by colleagues showed no evidence of ocular, cardiac or
> active pulmonary sarcoidosis. His recent[] imaging revealed no evidence of
> active sarcoidosis or progression, he had improvement in his mediastinal
> adenopathy, and had no concerning parenchymal changes for active sarcoidosis.
> Finally, he had no recent seizures.

(Tr. at 20-21.)

Most crucially, as noted above, the ALJ also relied on (1) an unfavorable prior

administrative decision and (2) the findings of the State agency medical consultants and other

medical opinion evidence when assessing both Plaintiff's statements and his overall RFC.

Regarding the prior decision, the ALJ described the previous findings as "generally

persuasive." (Tr. at 29.)  The ALJ noted that Plaintiff required additional reaching restrictions, but also noted that records showed "less seizures overall," and that his "mental fog from seizures" had stabilized compared to the previous time period.  (Tr. at 29.)  Notably, the RFC in the prior decision included no restrictions involving the need for additional breaks, absences, or time off-task (Tr. at 86), and it does not appear that Plaintiff asserts that his fatigue and/or shortness of breath appreciably worsened between May 15, 2019 and his alleged onset date of September 20, 2019.[6]  Similarly, as detailed extensively in subsection A of this Opinion, the ALJ relied on the medical opinion evidence.  (See Tr. at 29-32.)  Because the ALJ's decision clearly links the findings in the prior decision and the opinion evidence with the RFC assessment in the present case, the Court finds no basis for remand.  See Sineath v. Colvin, 1:16CV28, 2016 WL 4224051, at *5 (M.D.N.C. Aug. 9, 2016) ("'An ALJ may satisfy the function-by-function analysis requirement by referencing a properly conducted analysis of state agency consultants.'") (quoting Herren v. Colvin, No. 1:15-CV-00002-MOC, 2015 WL 5725903, at *5 (W.D.N.C. Sept. 30, 2015) (collecting cases)).

Ultimately, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets omitted).  Thus, the issue before the Court is not whether a different fact-

---

[6] The ALJ reviewed the intervening medical records, noting in particular that, "[t]he record from August 2021 showed [Plaintiff] reported feeling well from a breathing standpoint.  He had no shortness of breath, orthopnea, or chest pain." (Tr. at 26.)  Similarly, "evidence shows he presented in September 2022 and had been feeling well from a breathing standpoint until he recently developed chest pain and dyspnea that improved with inhalers." (Tr. at 20.)

finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained his decision, and explained the reasons for his determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner will therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #11] is DENIED, that First Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 30th day of September, 2024.

Joi Elizabeth Peake
United States Magistrate Judge

22